JOYCE BICHLER, Respondent-Appellant, et al., Plaintiff, v ELI LILLY AND COMPANY, Appellant-Respondent, et al., Defendants.

First Department, February 24, 1981

318

*Russel H. Beatie, Jr.,* of counsel *(Blair C. Fensterstock* and *Colin W. Ewing* with him on the brief; *Dewey, Ballantine, Bushby, Palmer & Wood,* attorneys), for appellant-respondent.

*Alfred S. Julien* of counsel *(Sybil Shainwald, Leonard J. Finz* and *David Jaroslawicz* with him on the brief; *Julien,*

*Schlesinger & Finz, P. C.,* attorneys), for respondent-appellant.

*Robert J. Sisk* of counsel *(Hughes, Hubbard & Reed,* attorneys), for Merck & Co., Inc., *amicus curiae.*

*Kathy Ann Bennett* for New York State Consumer Protection Board, *amicus curiae.*

*Myrna P. Field* and *Joseph W. Marshall, III,* of counsel *(John G. Collins,* attorney), for Mid-Atlantic Legal Foundation, Inc., and another, *amici curiae.*

OPINION OF THE COURT

KUPFERMAN, J. P.

Plaintiff Joyce Bichler brought this product liability action against defendant Eli Lilly and Company (Lilly) and two other defendants for damages sustained by her as a result of the use of the prescription drug diethylstilbestrol (DES), a synthetic estrogen, which her mother ingested in 1953 while pregnant with plaintiff.

At the age of 17, plaintiff was diagnosed as having carcinoma of the cervix and vagina. In 1972, she underwent a radical hysterectomy which removed her ovaries, both fallopian tubes and two thirds of her vagina. As a result of that operation, she cannot bear children and, as she has testified, her sexual relations with her husband are also impaired.

In 1974, she and her father brought this action against Lilly as the alleged manufacturer of the DES pills plaintiff's mother ingested, and against two other defendants who are no longer parties to the action. The claims of Mr. Bichler, the father, were barred due to the running of the Statute of Limitations.

A bifurcated trial was ordered by the trial court at Lilly's request. The first, a trial on the issue of manufacturer identification, commenced in May, 1979. At this identification trial, the jury found that plaintiff had not established by a fair preponderance of the credible evidence that defendant Lilly was the manufacturer of the DES pills her mother had taken. DES, as a generic drug, was, and still is, manufactured by a number of drug companies. Lilly dominated

the market at the time DES was approved by the Food and Drug Administration (FDA) and at the time plaintiff's mother used it.[1] As a major producer of the drug, Lilly also sold DES in bulk to other drug companies for use under their own names, a common practice in the drug industry. The pills Mrs. Bichler ingested were not identifiable by any markings. The dispensing pharmacist testified at this trial that he had stocked DES from four or five manufacturers, including Lilly, but was not able to recall, nor did he have the records to establish, which pills he chose to fill the prescription for plaintiff's mother. Plaintiff appeals from this verdict as against the weight of the evidence and claiming other errors committed by the trial court.

First, although the trial court did conduct most of the *voir dire* itself, objection to that practice is rendered meaningless where, as here, the record is clear that counsel for both parties had ample opportunity to scrutinize prospective jurors. Secondly, no prejudice to either party is shown by the fact that the court, after a thorough questioning by himself and both counsel, permitted a pharmacist's wife to become a juror. We find it significant that in this instance plaintiff did not challenge the juror for cause. We also find plaintiff's other claims of error to be without merit and further hold that upon review of the record, the jury's finding that Lilly was not proven to be the manufacturer of the DES pills ingested by Mrs. Bichler is not against the weight of the evidence.

Plaintiff, in her amended complaint, had claimed in the alternative that Lilly could be found liable even if it had not manufactured the DES Mrs. Bichler ingested. At the second trial, on this issue, the jury answered seven interrogatories, found Lilly liable and awarded damages in the sum of $500,000, plus costs, disbursements and interest. The verdict was reduced by the amount of a settlement with defendant doctor who prescribed the drug. In this second phase of the action, plaintiff proceeded against Lilly alone, as a tort-feasor jointly and severally liable. Plaintiff did so on an expanded theory of concerted action claiming Lilly

---

1. Expert evidence presented at trial approximated Lilly's share of the DES market to be some 45%.

and other manufacturers of DES did wrongfully test and market this drug for treatment of accidents of pregnancy. Lilly appeals from that part of the judgment based on the second verdict.

DES is synthesized from a coal tar derivative and is two and a half times more potent than natural estrogen. DES was developed in England in the late 1930's. It has never been patented.

As early as 1939, Lilly and other drug manufacturers filed applications with the FDA for permission to market the drug. These first filings were rejected because the basis of these applications were entirely foreign studies. In order to facilitate the second filing, 12 manufacturers, including Lilly, were convened at the behest of the FDA and agreed to co-operate with each other in the approval process. Thereafter, these 12 worked through a voluntarily formed committee known as the "Small Committee", which consisted of representatives of four of these companies and which was chaired by Lilly. Dr. Klumpp, the Chief Medical Officer of the FDA, who had requested the meeting, testified that he was told the Small Committee was formed to expedite the handling of the investigations and would represent the industry. The Small Committee pooled all clinical data pertaining to DES for submission. Lilly's literature became the model for the literature used as the package insert. This literature contained warnings that use of the drug was contraindicated only for women who had cancer or precancerous lesions of the breast or cervix, or had a family history of high incidence of breast or genital malignancy. At this trial, Dr. Hines, chairman of the Small Committee and the physician heading Lilly's DES project in 1939 and 1940, testified that in conjunction with the work on the drug, he believed he had read every article he could obtain on DES. Although the subsequent FDA approval was limited to use for several conditions, none of which related to pregnancy, there was evidence presented at trial that Lilly was even then contemplating use of DES for toxemia in pregnancy.

In 1947, Lilly and other drug companies filed supplemental applications with the FDA for permission to market

DES for treatment of certain complications of pregnancy involving early termination of the pregnancy or death of the fetus. The dosage contemplated for this use was several times stronger than the maximum permitted in 1941. This application was made primarily on the strength of two studies by independent researchers, which indicated that DES therapy saved a significant percentage of such high risk pregnancies.[2]

Despite the favorable indications of the specific studies relied on,[3] serious questions had also been presented, some prior to FDA approval and others prior to use by plaintiff's mother, concerning the drug's potential carcinogenic effect and its efficacy for accidents of pregnancy.[4]

Expert testimony was presented at trial to establish the state of scientific knowledge at the time of application to the FDA and during the following years prior to the date DES was prescribed for Mrs. Bichler. It was well known,

---

2. Sheiner, DES and a Proposed Theory of Enterprise Liability, 46 Ford L Rev 963 n 2: "Two medical sources in the 1940's were primarily responsible for the belief that DES would significantly reduce the incidence of threatened abortions, namely Karnaky, *The Use of Stilbestrol for the Treatment of Threatened and Habitual Abortion and Premature Labor: A Preliminary Report*, 35 S. Med. J. 838 (1942), and Smith, *Diethylstilbestrol in the Prevention and Treatment of Complications of Pregnancy*, 56 Am. J. Obstet. & Gynec. 821 (1948). Both of these studies were soon criticized for their lack of adequate controls, and subsequent controlled studies failed to substantiate these earlier claims of effectiveness. *See, e.g.,* Davis & Fugo, *Steroids in the Treatment of Early Pregnancy Complications*, 142 J.A.M.A. 778 (1950); Dieckmann, Davis, Rynkiewicz & Pottinger, *Does the Administration of Diethlystilbestrol During Pregnancy Have Therapeutic Value?*, 66 Am. J. Obstet. & Gynec. 1062 (1953); Robinson & Shettles, *The Use of Diethylstilbestrol in Threatened Abortion*, 63 Am. J. Obstet. & Gynec. 1330 (1952). Nevertheless, DES continued to be manufactured and prescribed for the prevention of abortions until 1971."

3. Lilly also refers in its briefs to Smith, Increased Excretion of Pregnanediol in Pregnancy from Diethylstilbestrol with Special Reference to the Prevention of Late Pregnancy Accidents, 51 Amer J Obstet. & Gynec. 411 (1946); White, Prediction and Prevention of Pregnancy Accidents in Diabetics, 115 J Amer Med Assn 2039 (1940); White, Pregnancy Complicating Diabetes, 3 J Clin Endocrin 500 (1943); Karnaky, Estrogenic Tolerance in Pregnant Women, 53 Amer J Obstet. & Gynec. 313 (1947); and Rosenblum & Melinkoff, Preservation of the Threatened Pregnancy with Particular Reference to the Use of Diethylstilbestrol, 55 Western J Surg Obstet. & Gynec. 597 (1947).

4. See note 2, *supra*. Plaintiff also refers to Jeffcote, Oestrogen Therapy in Pregnancy, 43 Proc Roy Soc Med 834 (1950); Crowder, The Management of Threatened Abortion: A Study of 100 Cases, 60 Amer J Obstet. & Gynec. 896 (1950).

before FDA approval was sought, that substances given a pregnant woman would pass through the placenta into the fetus. It was also well known that there were available tests on mice which, if conducted, would have demonstrated within six months the danger of cancer developing in the fetus after it had reached its maturity. In fact, three prominent Chicago physiologists had administered DES to rats and mice in 1939 and concluded that the hormone crossed the placenta and had malforming action on the fetus. In 1938, Dr. Charles Dodd, one of the British researchers responsible for synthesizing DES, had published a paper with respect to his findings in relation to DES. In his summary of conclusions, Dr. Dodd stated that DES could actually cause miscarriages or abortions, not save them. In the late 1940's, one of the studies cited in Lilly's supplemental application specifically questioned:

(1) Will diethylstilbestrol in large doses cause pituitary or other glandular imbalance which will become manifest later in life?

(2) Is diethylstilbestrol in such large doses carcinogenic, and as such unsafe to give even to pregnant women?

(3) Can diethylstilbestrol in any way affect the glandular balance of the child *in utero*, particularly the male child? (Rosenblum & Melinkoff, Preservation of the Threatened Pregnancy with Particular Reference to the Use of Diethylstilbestrol, 55 Western J Surg Obstet & Gynec 597, 601 [Nov., 1947].)

These reservations, however, were not noted on the application. Several other studies appearing in the period 1950-1953 questioned the efficacy of DES for complications of pregnancy.[5] There was, therefore, in existence in the period

---

5. See Notes 2, 3 and 4, *supra.*

Defendant, in a postargument letter, points to *Needham v White Labs* (639 F2d 394) for the proposition that reference to the efficacy of the drug and the benefit-risk theory in plaintiff's summation was improper. *Needham,* however, is distinguishable. In that case, the District Court had held that an ineffective product is a defective product. The Seventh Circuit disagreed with that ruling and held that admission of efficacy evidence could not be considered harmless where instructions to the jury clearly indicated that an alternate ground upon which to find defendant liable was that the drug was ineffective in preventing miscarriages. The judgment was reversed and the matter re-

before Mrs. Bichler's consumption of DES not only doubts as to efficacy but also scientific criticism of the lack of proper controls in those studies which had advocated use of DES. Despite these reservations, it is undisputed that none of the companies producing or marketing DES had performed any tests on the drug's effect on the fetus itself, either in humans or in animals, although DES was specifically aimed at the placenta and fetus.

As a result of several medical studies linking use of DES and similar synthetic estrogens to the subsequent development, after a latent period, of vaginal carcinoma in the users' daughters, exposed to the drug *in utero*, the FDA in 1971 contraindicated DES for use by pregnant women due to its probable danger and ineffectiveness. (See Sheiner, DES and a Proposed Theory of Enterprise Liability, 46 Ford L Rev 963, n 2.)

The points on appeal raise significant problems in products liability due to the peculiar nature of practices in the drug industry. The central issue of Lilly's appeal concerns the basis for imposing liability when an injured party, due to no fault of her own, but because of the practices of an industry, cannot identify the actual manufacturer of the product which produced the injurious effect, and thus meet the traditional tort law requirement of showing causation in fact. Courts in other jurisdictions have struggled with this same issue but have differed in their treatment of the theories relied upon.

There have been several approaches in tort law available to a plaintiff confronted with more than one actor who could

---

manded because, without a special verdict, the appeals court could not discern if the jury had found liability on the impermissible ground.

Such is not the case here. Evidence and testimony of the efficacy of DES was admitted first because it was relevant to a defense Lilly had wanted submitted to the jury, viz., that but for the ingestion of DES, the child would not have been born. At the conclusion of the trial, this defense was not submitted to the jury. Secondly, the trial court ruled that the state of knowledge concerning the efficaciousness of DES was relevant to measuring the risk-benefit factor, which in turn ran to the issue of whether the product was reasonably safe and the question of whether a drug company was acting reasonably in marketing the drug. At the time of the jury charge, the defendant did not request the court for an instruction that the jury disregard efficacy evidence.

be the causation in fact. In such instances where each such party acted independently but tortiously and it is proved that injury has been caused to plaintiff by only one of them, but there is uncertainty as to which one caused it, and where each can be joined as a defendant in the case, some courts have shifted the burden of proof of causation in fact to the defendants. *(Summers v Tice,* 33 Cal 2d 80; 5 ALR2d 91; Prosser, Torts [4th ed], § 41, pp 243-244.) Only if defendants cannot resolve the issue of causation in fact among themselves, are they held jointly and severally liable. This policy is justified on grounds of fairness and has been codified in subdivision (3) of section 433 B of the Restatement of Torts, Second. Plaintiffs should not be without a remedy merely because defendants' conduct has made it difficult or impossible to prove which defendant was the actual tort-feasor. Furthermore, defendants often have better access to evidence of causation than do plaintiffs. (Cf. *res ipsa loquitur.)* This theory has not been available where plaintiff has not or cannot join all possible defendants. Comment *h* to subdivision (3) of section 433 B of the Restatement of Torts, Second, did anticipate that this rule of double fault and alternative liability might be in need of modification under situations that had not yet arisen and, therefore, stated that the rule as written was not intended to preclude possible modification if such future situations required it.

The more usual theory used to obtain joint and several liability, is concert of action. According to Prosser, the principle of the theory as it has developed is that "[a]ll those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or ratify and adopt his acts done for their benefit, are equally liable with him." (Prosser, Torts [4th ed], § 46, p 292.)

In the instant case, Lilly contends that the trial court's charge on concerted action was erroneous and, furthermore, that the jury's finding of concerted action was not supported by the evidence. Lilly would have had that court charge concerted action according to subdivisions (a) and (c) of section 876 of the Restatement of Torts, Second. How-

ever, plaintiff's case was not being tried under the classic version of concerted action, but rather a modified version of that concept, expanded to adapt to the exigencies of trying a case in the rapidly developing area of the law of strict products liability.

Even with the classic usage of concerted action, Prosser tells us "[e]xpress agreement is not necessary, and all that is required is that there be a tacit understanding" and points to the example of the spontaneous decision of drivers to drag race. (Prosser, Torts [4th ed], § 46, p 292.) In the contested charge, the trial court instructed that the "implied or tacit agreement or understanding" element of concerted action could be evidenced by the "conscious parallel" conduct of the drug companies. The court further stated that concerted action could also be defined as "acting independently of each other in committing the same wrongful act, but although acting independently, their acts have the effect of substantially encouraging or assisting the wrongful conduct of the other, which, in this case, was the alleged failure to adequately test." Then the court charged: "Thus, if you find that defendant and the other drug companies either consciously paralleled each other in failing to test D.E.S. on pregnant mice, as a result of some implied understanding, or that they acted independently of each other in failing to do such testing, but that such independent actions had the effect of substantially aiding or encouraging the failure to test by the others, then you should find that the defendant wrongfully acted in concert with the other drug manufacturers in the testing and marketing of D.E.S. for use in accidents of pregnancy. Of course, you must also have found that it was wrongful for the defendant and the other drug companies not to have tested D.E.S. in pregnant mice because of the state of knowledge that was available to them in 1953."

Although Lilly's objection to the charge is none too clear, it behooves this court to address that objection on the merits.

It had been argued in *Sindell v Abbott Labs.* (26 Cal 3d 588, cert den — US —, 49 USLW 3270) the seminal California case on liability in DES cases, that a jury could find an implied agreement was evidenced by "conscious

parallelism". The Supreme Court of California did not accept this line of reasoning. To stretch concert of action to encompass a common practice in an entire industry was unacceptable to that court, first, because it would expand the doctrine far beyond its intended scope and, secondly, because of the possibility that "virtually any manufacturer [could be held] liable for the defective products of an entire industry, even if it could be demonstrated that the product which caused the injury was not made by defendant." *(Sindell v Abbott Labs., supra,* p 605.) That court went on to reject the "enterprise liability theory" suggested in *Hall v Du Pont de Nemours & Co.* (345 F Supp 353) and thoroughly discussed in an excellent law review note (Sheiner, DES and a Proposed Theory of Enterprise Liability, 46 Ford L Rev 963; see, also, Klemme, Enterprise Liability, 47 U of Colo L Rev 153). This theory has not been adopted by any jurisdiction in a DES case, but it seems California did apply some propositions associated with the theory which had been advocated in the Fordham note.

The *Sindell* court preferred to modify the double fault and alternative liability rule of *Summers v Tice (supra)*, as the Restatement comments suggested might be necessary. California, it seems, will now permit an action when plantiff joins the manufacturers of a substantial percentage of the appropriate DES market (i.e., only the producers of the DES that plaintiff's mother could have taken) as would be established at trial. Under the unaltered rule, there would be no rational basis, nor even a reasonable possibility, to infer that any joined defendant would be the causation in fact, yet there would be a possibility that the actual tort-feasor would escape liability. As modified, each joined defendant would be liable for a proportionate share of the judgment equal to its percentage of that appropriate market. Further to ensure a fair result, each defendant would still have the opportunity to prove it was not the actual producer.

In *Abel v Lilly & Co.* (94 Mich App 59), the Michigan Court of Appeals had before it defendants' motion for summary judgment for failure to state a cause of action on the grounds that each of the plaintiffs did not (because

they could not) allege specifically which defendants produced the DES that caused the harm to each respective plaintiff. Plaintiffs had named as defendants all the known manufacturers of DES whose products were distributed in Michigan during the relevant time period. In its discussion, that court observed that the remedy for plaintiffs in products liability cases is one which "the courts should be free to develop further." (94 Mich App, at p 69.) The complaint alleged both alternative liability and concerted action. The court, in ruling for the plaintiffs, held that allegations that "defendants acted in concert to produce and market ineffective and dangerous products, without adequate testing and without adequate warnings" (94 Mich App, at p 72) were sufficient to state a cause of action. In so ruling, the court made no comment as to what would constitute sufficient acceptable evidence to establish acting in concert. The court also permitted reliance on alternative liability. In its discussion of its ruling, the court noted the flexibility of courts in recognizing special circumstances and a general reliance on a policy of fairness when allocating the burden of proof of causation.

In both of these cases, the court recognized the special circumstances facing the majority of prospective plaintiffs allegedly harmed by DES. These courts opined that the law, especially in the products liability area, was not so rigid as to preclude an injured party, with an otherwise valid claim, from a remedy under such circumstances, and indicated that existing law does, and will continue to adapt to the exigencies of rapidly developing technologies. (Cf. *Caprara v Chrysler Corp*, 52 NY2d 114.)

This court recognizes, as did the courts in California and Michigan, that identification problems arise both as the result of the passage of time as well as the result of industry practice. The specific problems presented by the widespread use of generic drugs, which render identification almost impossible to the user, let alone the ultimately harmed person, plus the absence of any uniform requirement for pharmacies to keep and maintain records over extended periods, cannot be permitted to prevent valid recoveries nor to allow some manufacturers to escape their liability altogether by

means of this shroud of anonymity.[6] We of this court, too, adhere to the view of Dean Pound that "[t]he Law must be stable but must not stand still."

It does not strain one's sense of fairness to allow a limited expansion of the doctrine of concerted action to cover the type of circumstances faced in a DES case where the traditional evidentiary requirements of tort law may be insurmountable. Our acceptance of such a modification of this doctrine is not without precedent.

In *Hall v DuPont de Nemours & Co. (supra)*, the defendants were corporate manufacturers of dynamite blasting caps, comprising virtually the entire industry, and the industry's trade association. Like plaintiff Bichler, plaintiff children in *Hall* who had been injured by these caps, could not identify the particular manufacturers of the defective product which caused their injuries, in this instance, because the product had been obliterated by the explosions. Plaintiffs pleaded concert of action on the basis of an alleged agreement by defendants not to warn of the product's danger. The court directed the burden of proof of causation be shifted to defendants, in essence combining elements of concert and alternative liability.

Judge JACK B. WEINSTEIN, now Chief Judge of the Eastern District of New York, engaged in an extended discussion of cases which served to illustrate that, when confronted by a group having control of risk, courts have imposed joint and several liability on the members comprising the groups when identity of the direct cause could not be determined. *(Hall v DuPont de Nemours & Co.,* 345 F Supp, *supra*, at pp 372-374.) The issue of causation then becomes distinctly secondary to the fact that the group

6. In an earlier stage of this case, we dismissed plaintiff's cause of action against the dispensing pharmacist Leo Willing. *(Bichler v Willing,* 58 AD2d 331.) In discussing the limits of the obligations of a pharmacist, we observed: "as was perceived in *Codling v Paglia (supra)*, pp 340-341 'In today's world, it is often *only the manufacturer* who can fairly be said to know and to understand when an article is * * * safely made for its intended purpose. Once floated on the market, many articles * * * defy detection of defect * * * [*T*]*he manufacturer* * * * *alone* * * * has the practical opportunity * * * to turn out useful * * * but safe products.' (Emphasis added.) These remarks are especially appropriate to the drug field." *(Bichler v Willing,* 58 AD2d, at p 335.)

engaged in joint hazardous conduct. This control of the risk (the basis for finding the concert of action) can be shown, said the court, by evidence of an explicit agreement, by evidence of defendants' parallel behavior sufficient to support an inference of tacit agreement or co-operation, or by evidence of independent adherence to industry-wide safety standards. *(Hall v DuPont de Nemours & Co., supra, pp 372-374.)*

In this context, it is worthy of note that in antitrust cases, evidence of conscious parallel behavior without express agreement of conspiracy has long been accepted by the Supreme Court as a basis for a finding of conspiracy. *(Theatre Enterprises v Paramount, 346 US 537; Interstate Circuit v United States, 306 US 208, 226-227.)*

In the instant case, there was ample evidence from which a jury could determine Lilly was engaged in concerted action. The original co-operation by the 12 manufacturers and pooling of information, the agreement on the same basic chemical formula, and the adoption of Lilly's literature as a model for package inserts for joint submission to the FDA in 1941, can rationally be construed as an express agreement for purposes of finding concerted action, even if such co-operation was first invited by the FDA. And Lilly, it will be remembered, was the leader of the voluntarily formed Small Committee, which organized and expedited the effort for the 12. By this activity, these manufacturers were acting on behalf of all later manufacturers of DES inasmuch as they set the pattern for acceptance by the FDA. There was evidence in abundance of conscious parallel activity thereafter by the drug companies which later sought FDA approval of DES for use in treating risks of pregnancy, evidence from which may be inferred a tacit understanding. In fact, by terms of the FDA supplemental application form, applicants for this new usage of DES could, and did, rely on the data contained in the original application for DES usage concerning which no change was proposed. There was also some evidence that Lilly encouraged others to so rely. And, again, it is to be remembered that the data of the original application for DES approval used by each drug company was that which was commonly agreed upon and

submitted by the original 12 manufacturers, in accordance with the work of the Small Committee chaired by Lilly. It follows that all such reliance and co-operation was beneficial to each producer of DES. It is obvious that to hold up a product's distribution for further testing would not be economically feasible in the race to win a market share. Although Lilly was the second manufacturer to make the supplemental application, it was also the leading manufacturer, and subsequent applications by others requested the same standard new dosage and relied on the same set of research studies as Lilly.

As can easily be seen, the evidence implicating Lilly in this concerted action was overwhelming. That the omission adequately to test was wrongful, was a question of fact decided by the jury against Lilly.

█ It comes as no surprise that Lilly strongly opposes this imposition of liability on the ground that it is unfair to single it out. Mrs. Bichler's pharmacist did indeed testify that he stocked the DES of four or five producers, including The Upjohn Company, E. R. Squibb & Sons, American Pharmaceutical and Lilly. (Upjohn and Squibb were among the original 12 applicants in 1941 and were also members of the Small Committee.) But, because Lilly was found to be a participant in concerted action, Lilly is jointly and severally liable as but one of a number of wrongdoers. Despite the fact that Lilly may not be the direct cause of plaintiff's injury, imposition of liability on Lilly is not unfair. It is plaintiff's option to proceed against any joint tort-feasor. (Graphic Arts Mut. Ins. Co. v Bakers Mut. Ins. Co. of N.Y., 45 NY2d 551.) Lilly may in turn pursue other manufacturers, which it determines may be liable. (Dole v Dow Chem. Co., 30 NY2d 143; see, also, DeWitt Props. Assoc. v City of New York, 47 AD2d 300, 303-304.)

█ Lilly, too, disputes an assessment introduced at trial as to the size of its market share as approximately 45%, and testimony to the effect that it dominated the market. However, comment on or evidence of comparative size is permissible if not sufficiently prejudicial to a party, as even Lilly admits. (Cf. Cherry Creek Nat. Bank v Fidelity & Cas. Co. of N. Y., 207 App Div 787, 790-791.) The situations

to which Lilly cites, where this kind of comment or evidence required reversal, only bolster our conclusion that such evidence and comment in this case was not prejudicial. (See *Adams v Acker*, 57 AD2d 741, app dsmd 42 NY2d 965.) Nor were these comments to show the defendant's ability to pay damages, which would be improper. *(Nicholas v Island Ind. Park of Patchogue*, 46 AD2d 804.)

Lilly contends that it was error not to charge foreseeability in the court's strict liability charge, and further contends that the jury finding of foreseeability was against the weight of the evidence. Lilly first contends that New York has not specifically considered the application of strict liability to a manufacturer of prescriptions, although the Second Circuit would seem to disagree. *(Tinnerholm v Parke, Davis & Co.*, 411 F2d 48, 53-54.) Lilly relies on comments *i*, *j* and *k* of section 402 A of the Restatement of Torts, Second, and cases in other jurisdictions for its assertion that a charge on foreseeability is necessary. The charge as given is in accordance with the New York Pattern Jury Instructions, Strict Liability Charge (PJI 2:141 [1980 Supp]). New York requires, as Lilly duly notes, that a plaintiff prove a product is "unreasonably dangerous". *(Bolm v Triumph Corp.*, 33 NY2d 151.) The first interrogatory and the corresponding charge to the jury concerned that issue. In order to find that DES was "unreasonably dangerous" (the New York Pattern Jury Instructions uses the term "reasonably safe" as did the trial court, and Lilly's objection to this difference is without merit; also, see, *Cronin v J.B.E. Olson Corp.*, 8 Cal 3d 121), the jury had to decide whether a reasonable manufacturer would have marketed the drug if present knowledge of the drug's effect had been known in 1953.

■ The court went on to give a very specific charge and corresponding interrogatory on foreseeability, one to which all jurors responded in the affirmative. This charge was made in conjunction with the charge on finding concerted action, to which Lilly objects. Lilly argues that this "mutilated treatment" of foreseeability tainted the integrity of the trial, since it came after the instruction on the prior interrogatory. By this sequence of treatment, a decision

would have been reached on whether the drug was safe before the decision of foreseeability had been made. Thus, the first decision would have been made without a proper basis and could improperly influence determination of the remaining issues. We are not persuaded by this reasoning. The charge on foreseeability was not specifically directed at Lilly but was broader in its purpose. That charge and interrogatory sought to determine whether this defendant and other DES manufacturers wrongfully failed to test on pregnant mice. To find this omission to test wrongful, the jury was instructed first to determine whether, in 1953, when Mrs. Bichler used DES, a reasonably prudent manufacturer should have foreseen that DES might cause cancer in the pregnant users' offspring, considering the state of scientific knowledge and techniques then existing. If the jury concluded this was foreseeable, the court proceeded to ask, would a prudent manufacturer have then tested DES on pregnant mice, and would the results of such tests have prevented such a manufacturer from marketing the drug in 1947 or prompted it to remove the drug from the market by 1953. A careful reading of the charges and the corresponding interrogatories, and a consideration of the sequence of the charges does not reveal prejudice or error.

■ Furthermore, the subsequent unanimous finding of foreseeability is not even arguably against the weight of the evidence. There was expert opinion submitted by both sides as to the potency of the drug, the knowledge of drugs passing the placental barrier coupled with the focus of the drug being the placenta and fetus, the knowledge that it caused cancer in animals and might cause cancer in humans, the state of testing of mice in the 1940's and early 1950's, and the existence of studies questioning the controls on studies upon which the manufacturers relied, taken together, constitute a sufficient basis to warrant the subsequent jury finding.

Defendant questions the trial court's refusal to charge that the prescribing physician must have relied on the literature accompanying the drug. Inasmuch as none of the literature accompanying DES in 1953 contained warnings relevant to risks of pregnancy, which, if relied upon, would

have prevented the resulting injury, this contention is meaningless.[7]

The contention that the court erroneously refused to admit alleged evidence that plaintiff attempted to fabricate evidence, is likewise without substance. Even if the plaintiff's counsel did indicate to the dispensing pharmacist that if he (the pharmacist) could state that it was Lilly's product he selected to fill Mrs. Bichler's prescription, plaintiff would be willing to drop her action against him, there is no authority presented which would render the trial court's decision improper or an abuse of discretion. At most, the incident can be considered distasteful and, in any event, the pharmacist did not comply.[8]

Defendant's criticism of the manner in which the trial court, upon notification of an impasse, urged the jury to reach a verdict does not set forth any behavior which rises to the level necessary to constitute any abuse of discretion. The same can be said of the court's handling of the minor illness of a juror. There is nothing presented to indicate an abuse of discretion.

Nor do we find error with the court's refusal to grant defendant's request for a noncompromise verdict charge.

---

7. *Wolfgruber v Upjohn Co.* (72 AD2d 59 [CARDAMONE, J.], affd on the opinion below 52 NY2d 768) is cited by the defendant for the proposition that in a prescription drug case where the drug is accompanied by a warning, the drug must be assessed under the concept of duty to warn. In *Wolfgruber*, defendant's motion for summary judgment was granted against plaintiff physician who had prescribed for himself a drug manufactured by defendant, which drug had produced injurious side effects. The Fourth Department found that since there had been a sufficient warning on the package insert as to the specific side effects of the drug, and the plaintiff as a physician had known of those risks, there was no fact issue for a jury.

*Wolfgruber (supra)* is distinguishable from the instant case. Here, plaintiff was not proceeding on failure adequately to warn for her theory of liability. Such a theory invokes comment *k* of section 402 A of the Restatement of Torts, Second, which provides that a product is not unreasonably dangerous if accompanied by proper warnings. But here plaintiff alleged the product was defective because it was not reasonably safe, as marketed, for the risks of pregnancy, that DES should not have been marketed at all for that purpose, with or without warnings. Furthermore, as we have noted, there were no warnings of the risk at issue. Under these circumstances, plaintiff is not compelled to argue the "duty to warn" as part of her case.

8. The pharmacist, Leo Willing, was a named defendant in this case. This court later dismissed plaintiff's action against him. *(Bichler v Willing,* 58 AD2d 331.)

*Van Der Harst v Koenig* (249 App Div 235) is distinguishable. In that case it appeared that, immediately after the court's refusal to charge the jury that a compromise of liability is not permitted merely to escape a disagreement, the foreman responded, "It seems to be that we can compromise and we can't, and I am a little at a loss here." (249 App Div 235, 237.) It is due to that express confusion that this court held that the trial court should have given the requested charge. The verdict in that case clearly indicated (p 237) "that the jurors concluded they had the right to compromise liability, or to compromise upon the amount of damages whether or not the evidence warranted it, so long as they reached a verdict." The circumstances of the instant case do not compel a similar result. At most, a refusal to so charge in this case is harmless error.

The general verdict for plaintiff was unanimous. With regard to the written interrogatories, the jury was instructed that five of the six jurors must concur, "but the same five persons need not concur on all of the answers." Lilly did not object to the written verdict sheet containing these instructions. When the verdict was rendered, five jurors found on the first interrogatory that DES was *not* reasonably safe when marketed in 1953. Although the instructions following this question indicated that a juror voting in the affirmative on this issue should not vote on the remaining questions, the juror so voting continued to answer the remaining questions and then gave the general verdict, all against Lilly. On the second interrogatory, a different five jurors found that DES had caused plaintiff's injuries, with one juror abstaining. Lilly argues that the jurors' answers were thus inconsistent and that, therefore, the verdict is constitutionally invalid.

It is to be noted that Lilly did not request that the jury be polled, nor did it ask to see the signed answer sheets to the interrogatories until after the jury had been discharged. Had Lilly acted in a timely fashion, it would have been proper practice for the court to have the jury clarify its determinations, reconcile answers to interrogatories with the verdict, or reconsider its verdict in order to correct any obvious misunderstanding. *(Vathy v Rupp Rental Corp.,*

43 AD2d 892; *Bischert v Limousine Rental Serv.*, 33 AD2d 355.)

■ On the merits we hold that the verdict is not constitutionally invalid. The comment to charge 1:96 of the New York Pattern Jury Instructions (General Instruction—Verdict with Written Interrogatories, 1 NY PJI 2d 101) is directly in point. "Since CPLR 4111(c) authorizes * * * less than unanimous action by a jury, it should follow that the same five jurors need not agree on all the issues, see Reed v Cook, 103 NYS2d 539 (n.o.r.); Ward v Weeks, 107 NJ Super 351, 258 A2d 379." (See, also, *Forde v Ames*, 93 Misc 2d 723, 725.)

For the foregoing reasons, the judgment of the Supreme Court, Bronx County (FRAIMAN, J. and a jury) entered April 24, 1980, and modified by an order entered May 9, 1980, should be affirmed, with costs and disbursements.[9]

BIRNS, FEIN and SANDLER, JJ., concur.

Judgment and order, Supreme Court, Bronx County entered on April 24, 1980 and May 9, 1980, respectively, affirmed. Plaintiff-respondent-appellant shall recover of defendant-appellant-respondent $75 costs and disbursements of these appeals.

---

9. As this opinion was being released, there became available the decision of the Superior Court of New Jersey, Appellate Division, in *Namm v Frosst* (178 NJ Super 19) where the plaintiffs sued 74 companies (serving 44), part of some 300 which have manufactured or sold DES at some time. There was no way to tell which company or companies actually supplied the pills in question. The Trial Judge granted summary judgment as to all 44 defendants due to the lack of identification, and the Appellate Division affirmed. However, the intermediate appellate court added that it could not adopt the theory of alternative or enterprise liability in view of the lack of higher court precedent or legislation. Under the facts of our case at bar after trial, we do not consider that we depart to any great extent from settled principles of law.