JAMIE CARRAO, an Infant, by Her Father and Natural Guardian, JON CARRAO, et al., Appellants-Respondents, v MICHAEL HEITLER et al., Defendants, and DOW CHEMICAL COMPANY, Respondent-Appellant.

JAMIE CARRAO, an Infant, by Her Father and Natural Guardian, JON CARRAO, et al., Appellants, v ELI LILLY AND COMPANY, Defendant, and MERCK, SHARP & DOHME, DIVISION OF MERCK & CO., et al., Respondents.

First Department, May 20, 1986

### APPEARANCES OF COUNSEL

*William D. Fireman* of counsel *(Alfred S. Julien* with him on the brief; *Julien & Schlesinger, P. C.,* attorneys), for plaintiffs.

*William M. Savino* of counsel *(Stephen J. Smirti, Jr.,* and *Diane M. Trippany* with him on the brief; *Rivkin, Radler, Dunne & Bayh,* attorneys), for respondent-appellant.

*Richard C. Browne* of counsel *(Carl H. Sword* and *Cynthia J. Danza* with him on the brief; *Costello & Shea,* attorneys), for Merck, Sharp & Dohme, respondent.

*Eric A. Portuguese* of counsel *(Steven B. Prystowsky* with him on the brief; *Lester Schwab Katz & Dwyer,* attorneys), for Philips Roxane Laboratories, respondent.

### OPINION OF THE COURT

Ross, J.

Over the last 35 years an increasing number of different vaccines to prevent disease were developed and made available to the general public. A few of the well-known diseases that these vaccines have tried to vanquish are: poliomyelitis *(Reyes v Wyeth Labs.,* 498 F2d 1264, 1269-1270 [5th Cir 1974]); the "swine flu" epidemic *(Low v United States,* 463 F Supp 948, 949 [ED Va 1978]); and, diphtheria as well as pertussis or whooping cough *(Parke-Davis & Co. v Stromsodt,* 411 F2d 1390, 1391 [8th Cir 1969]).

Many of these vaccines have achieved incredible success. The Sabin and Salk vaccines have virtually eliminated poliomyelitis as a disease that each year throughout this Nation disabled for life thousands of young people, who had previously been healthy. For example, "In 1952 alone, there were 57,879 reported cases of polio in the United States; 21,269 of these resulted in crippling paralysis to the victims [However, after widespread dissemination of the Sabin and Salk vaccines, by] 1970 * * * the number of those stricken by polio had diminished * * * [to] just 33 individuals to be afflicted during that year" *(Reyes v Wyeth Labs., supra,* at pp 1269-1270).

Sometimes vaccines harm the very persons that they are intended to protect. In the case of *Reis v Pfizer, Inc.* (61 AD2d 777 [1st Dept 1978]), oral polio vaccine was given to an infant, who thereafter developed poliomyelitis, which ultimately culminated in permanent crippling. Another illustration of a tragedy resulting from a vaccine is the case of *Parke-Davis & Co. v Stromsodt (supra),* wherein the inoculation of a very young child with the vaccine "Quadrigen", which is intended for use in simultaneous immunization against four major children's diseases: diphtheria, tetanus, whooping cough and poliomyelitis, led to irreversible brain damage.

Historically, before 1963, a person, who was injured by using a manufactured product such as a vaccine, could pro-

ceed against the manufacturer of such vaccine, either on the tort theory of negligence or the contract theory of breach of warranty. However, those two legal theories of negligence and breach of warranty provided little realistic protection to a consumer, who was harmed by a manufacturer of a defective product.

First, the inadequacy of the negligence theory. Invariably, the injured party was unable to prove the manufacturer's negligence. The reason was obvious. Usually the injured party was "not in a position to isolate the negligence which led to the defect since * * * [they were] not familiar with the manufacturing process" *(Butaud v Suburban Mar. & Sporting Goods*, 555 P2d 42, 44 [Sup Ct of Alaska 1976]).

Second, the inadequacy of the breach of warranty theory. By the very nature of the warranty theory being based upon contract law, it posed substantial obstacles to the recovery of damages by an injured consumer from the manufacture of a defective product. In the breach of warranty theory, the key was the contract of sale of the commodity, since the seller's promise was made solely to the buyer, with whom the seller had directly dealt. Thus, the contractual basis of a breach of warranty cause of action implied that only those in privity of contract with the seller could assert a claim.

In 1960, a California court used a theory of breach of implied warranty to find liability against a manufacturer of Salk vaccine, even though this manufacturer was not in privity with the injured party. The name of this case was *Gottsdanker v Cutter Labs.* (182 Cal App 2d 602, 6 Cal Rptr 320 [Dist Ct of App, 1st Dist, Div 2, 1960]). In the *Gottsdanker* case, two children allegedly contracted poliomyelitis soon after being inoculated with the vaccine, which had been manufactured by the defendant Cutter Laboratories. There had been no direct sale of this vaccine to the plaintiffs in the *Gottsdanker* case, since the vaccine injected into each child had been purchased by a physician from a pharmacy in a sealed bottle or ampule. The court in *Gottsdanker (supra,* at pp 606, 608, at pp 324, 326) held that the manufacturer was liable to the plaintiff children, in view of the fact that: "The vaccine here used was manufactured for the express purpose of supplying doctors who would inject it into the bodies of persons seeking inoculation against poliomyelitis. Clearly it is the patient, and not the doctor, who is the ultimate consumer of the vaccine. While a sale is essential to impose liability under the implied warranties, the initial sale to distributor or re-

tailer of pharmaceuticals is sufficient to impose upon the manufacturer the responsibility of fulfilling the implied warranties which run to the benefit of the persons whom the manufacturer intended to be, and who in fact became, the 'consumers' * * * Defendant's [Cutter Laboratories, the manufacturer] vaccine contained live and active poliomyelitis virus. Thus the vaccine was not 'wholesome'—it was neither merchantable nor fit for its intended purpose".

Since there was widespread dissatisfaction in the courts with both the negligence theory and the breach of warranty theory, when an injured consumer tried to assert a claim against a manufacturer of a defective product, in 1963 the doctrine of strict products liability was born (see, for the history of the development of this doctrine, Prosser, Torts, at 641-644 [4th ed 1971]).

The doctrine of strict products liability, in substance, imposes liability upon a manufacturer of a defective product, even though the injured party is not in privity with the subject manufacturer.

It is commonly agreed that the case that gave birth to the doctrine of the strict products liability of a manufacturer was *Greenman v Yuba Power Prods.* (59 Cal 2d 57, 377 P2d 897 [Sup Ct of Cal 1963]). The *Greenman* case *(supra)* was a personal injury action brought against, among others, the manufacturer of a Shopsmith, which is a combination power tool that could be used as a saw, drill, and wood lathe. In holding the manufacturer liable for the plaintiff's injury, the California Supreme Court stated *(supra, p 59, p 900)* that: "A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being". Furthermore, the court in *Greenman* noted *(supra, p 60, p 901)* that: "The purpose of such liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves".

The Court of Appeals in this State has held, in *Codling v Paglia* (32 NY2d 330, 342 [1973]) that: "under a doctrine of strict products liability, the manufacturer of a defective product is liable to any person injured or damaged if the defect was a substantial factor in bringing about his injury or damages; provided: (1) that at the time of the occurrence the

product is being used (whether by the person injured or damaged or by a third person) for the purpose and in the manner normally intended, (2) that if the person injured or damaged is himself the user of the product he would not by the exercise of reasonable care have both discovered the defect and perceived its danger, and (3) that by the exercise of reasonable care the person injured or damaged would not otherwise have averted his injury or damages."

Defects in a manufactured product can consist of a "mistake in manufacturing * * * improper design * * * or * * * the inadequacy or absence of warnings for the use of the product" *(Robinson v Reed-Prentice Div. of Package Mach. Co.,* 49 NY2d 471, 478-479 [1980]).

The instant appeal involves a personal injury, medical malpractice, and product liability action, arising from the administration of measles vaccine to the infant plaintiff. It is undisputed that there were a number of pharmaceutical firms that manufactured the measles vaccine in 1970 at the time that the plaintiff was inoculated with it. The perplexing problem presented herein is which one of several firms actually manufactured the vaccine administered to this plaintiff.

In New York, the general rule is that the plaintiff has the burden of proof of product identification *(Morrissey v Conservative Gas Corp.,* 285 App Div 825 [1955], *affd* 1 NY2d 741 [1956]). However, a Federal court has suggested a doctrine of "enterprise liability" to deal with those cases where the manufacturer of a product cannot be exactly identified.

The United States District Court for the Eastern District of New York, in the case of *Hall v Du Pont De Nemours & Co.* (345 F Supp 353 [EDNY 1972]) appears to have been the first court to use the term "enterprise liability" *(see,* Sheiner, *DES and a Proposed Theory of Enterprise Liability,* 46 Fordham L Rev 963, 974 [1978]). The *Hall* case *(supra)* involved 18 separate accidents that had occurred across the Nation, in which children had been injured by blasting caps, that neither contained any warning nor any indication of who had manufactured the offending cap. In pertinent part, the *Hall* court stated *(supra,* p 378) that: "To establish that the explosives industry should be held jointly liable on enterprise liability grounds, plaintiffs * * * will have to demonstrate defendants' joint awareness of the risks at issue in this case and their joint capacity to reduce or affect those risks. By noting these requirements we wish to emphasize their special applicability

to industries composed of a small number of units. What would be fair and feasible with regard to an industry of five or ten producers might be manifestly unreasonable if applied to a decentralized industry composed of thousands of small producers."

In the case of *Bichler v Lilly & Co.* (79 AD2d 317 [1st Dept 1981], *affd* 55 NY2d 571 [1982]), this court adopted a theory of concerted action liability. The plaintiff in the *Bichler* case had developed vaginal carcinoma, as a result of her mother having taken the drug diethylstilbestrol (DES), while she was pregnant with plaintiff. We held in *Bichler (supra)* that the plaintiff could recover against the defendant under this theory of concerted action liability, since even though this defendant had not been identified as the manufacturer of the particular DES pill taken by plaintiff's mother, defendant was one of several manufacturers of DES, whose product was stocked by the pharmacy that dispensed the offending pill to plaintiff's mother. Furthermore, we pointed out *(supra,* p 331) that: "Despite the fact that [defendant] may not be the direct cause of plaintiff's injury, imposition of liability on * * * [defendant] is not unfair. It is plaintiff's option to proceed against any joint tort-feasor * * * [Defendant] may in turn pursue other manufacturers, which it determines may be liable."

When she was nine months old in September 1970, the infant plaintiff, Jamie Carrao, was given an injection of measles vaccine. After receiving this injection, the infant plaintiff began to experience seizure episodes together with fever and rash. Subsequently, the plaintiff was found to be suffering from epilepsy and to be mentally retarded [note: As of the present time, the infant plaintiff is institutionalized in a permanent home for severely retarded persons].

In 1975, the infant plaintiff, by her father and natural guardian Jon Carrao (Mr. Carrao), and Mr. Carrao individually, commenced an action to recover damages for the alleged injury she suffered, as a result of being injected with the measles vaccine. The plaintiffs brought their 1975 action against defendants Dr. Michael Heitler (Dr. Heitler) and Dr. Alan Haber (Dr. Haber), who were the two pediatricians under whose care the infant plaintiff had been when the measles vaccine was administered to her, and the Dow Chemical Company (Dow), whom it was believed had manufactured the vaccine.

Subsequently, when the plaintiffs learned that the measles

vaccine in question may have been manufactured by a pharmaceutical company other than Dow, in 1979 they brought a second action, in which they named as defendants, Eli Lilly and Company (Lilly), Merck, Sharp & Dohme, Division of Merck & Co. (Merck), and Philips Roxane Laboratories, Inc. (Roxane).

By order of the Supreme Court, New York County (Nathaniel Helman, J.), entered October 30, 1979, these two actions were consolidated.

Thereafter, in 1982, there was a motion and a number of cross motions by the pharmaceutical companies and the plaintiffs for, *inter alia,* summary judgment in their favor on the issue of product identification. In substance, according to the moving parties, this flurry of motions was triggered by the testimony produced at examinations before trial of: (1) a representative of defendant Dow; (2) defendants Drs. Heitler and Haber; and (3) the parents of the injured infant. Thus, (1) defendant Roxane moved and defendants Merck and Lilly cross-moved for summary judgment, upon the ground that allegedly this deposition testimony, mentioned *supra,* conclusively established that defendant Dow manufactured the subject measles vaccine; (2) defendant Dow responded by: (a) opposing the motion and cross motions of defendants Roxane, Merck and Lilly, and (b) cross-moving for summary judgment, since, *inter alia,* allegedly it did not manufacture the vaccine; and (3) plaintiffs also cross-moved for partial summary judgment against defendant Dow.

Subsequently, Special Term (David H. Edwards, J.), *inter alia,* (1) denied the motion and cross motions of defendants Roxane, Merck and Lilly, based on product identification, without prejudice to renewal after completion of discovery; and (2) denied the cross motions of defendant Dow and of the plaintiffs. In pertinent part, Special Term noted: "The court is reluctant to grant summary judgment to any of the parties on the issue of product identification where this issue has not been established. The selected excerpts of Doctors Haber's and Heitler's depositions do not persuade this court that the manufacturer of the vaccine administered has been identified. Although, the evidence adduced thus far is strongest against Dow Chemical, it is by no means conclusive nor, for that matter, does it reach the standard of a preponderance of the evidence."

Following the entry of Special Term's order, it was appealed, and this court affirmed (105 AD2d 1167 [1984]).

Thereafter, a representative of Roxane was questioned at an examination before trial.

On the eve of trial, in or about March 1985, defendant Lilly moved by order to show cause to renew and reargue its prior motion for summary judgment, and defendants Merck, Roxane and Dow again cross-moved for the same relief. All four of these defendants, in substance, claimed that the evidence leads to the conclusion that none of them manufactured the measles vaccine used on the infant plaintiff. Furthermore, in response, plaintiffs: (1) did not oppose defendant Lilly's motion; (2) opposed the cross motions of Merck and Roxane; and (3) cross-moved for partial summary judgment against defendant Dow, in the event that Trial Term granted summary judgment in favor of defendants Merck and Roxane.

Trial Term (Ira Gammerman, J.), *inter alia*, on this issue of product identification: (1) granted, on the consent of the plaintiff, the motion of the defendant Lilly for summary judgment; (2) granted the cross motion of Merck and Roxane for summary judgment; and (3) denied the cross motions of defendant Dow and the plaintiffs.

After our review of the evidence, we find that Trial Term erred in granting summary judgment to defendants Merck and Roxane, since there are many triable issues of fact as to whether either one of these defendants manufactured the offending vaccine.

Summary judgment is not justified, when triable issues of fact are present *(Rotuba Extruders v Ceppos,* 46 NY2d 223, 231 [1978]).

As mentioned *supra,* defendants Drs. Haber and Heitler were the infant plaintiff's pediatricians, when the measles vaccine was injected into her in September 1970. At the time of this incident, these two doctors were partners and shared the same office space. Furthermore, as mentioned *supra,* both of these doctors were questioned at examinations before trial.

Consistently, Dr. Haber, who actually administered the vaccine, has testified that, to the best of his knowledge, the vaccine he used was trade named Lirugen, which was a product produced by Dow.

Defendant Dow has offered evidence, which has not been persuasively contradicted, that in 1970 Lirugen could be described as follows: (1) that, it came in a cake/solid tablet form, which was pink in color; (2) that, it was supplied in *one* package, which contained a vial of the vaccine, a vial of

diluent (note: diluent is a sterile water solution to mix with the vaccine), and an empty disposable syringe; and (3) that, in order to use it required a two-step reconstitution process, to wit: (a) since the syringe, mentioned *supra*, contained no diluent, this empty syringe had to be injected into the vial that contained the diluent, so that the diluent could be drawn into this syringe, and (b) then, as mentioned *supra*, to complete the reconstitution, the diluent-filled syringe would be injected into the second vial, containing the vaccine, and shaken up.

Even though Dr. Haber had testified that he believed that he used Lirugen, he admitted that at the time of the incident his office stocked and used two different measles vaccines. His partner, Dr. Heitler, testified that, although Lirugen was the main measles vaccine used, a small supply of a vaccine produced by Roxane was kept on hand for use on egg-allergic patients.

Documentary evidence indicates that in 1970, while the Roxane vaccine was to be given with a coadministration of Immune Serum Globulin or of Measles Immune Globulin (gamma globulin), the Dow vaccine was to be given without gamma globulin. Moreover, examination of the office records of these doctors indicate that the infant plaintiff had been tested for possible allergies, and that eggs had been eliminated from her diet in November 1970, during the testing period. Although the doctors and the infant plaintiff's parents testified that ultimately she was found not to be egg-allergic, that does not definitively dispose of the issue of whether the Roxane vaccine had been used. Nowhere do the doctors unequivocally testify that they had not taken an extra cautious approach and used the Roxane vaccine. Support for the conclusion that the Roxane vaccine could have been used is found in the office records of these doctors. In pertinent part, in the records appears the date: September 19, 1970, which was the date that the offending vaccine was injected into the infant plaintiff, and that date appears next to a preprinted box entitled: "MEASLES (Live attenuated virus) (Live attenuated virus plus immune globulin)". Incidentally, two other preprinted boxes appear on that record, which pertain to measles immunization, and neither one of those boxes appear to contain either a date or any other writing. These two other boxes are entitled: (a) "MEASLES (inactivated vaccine)"; and (b) "MEASLES-COMBINED SCHEDULE (Inactivated and live attenuated vaccines) Inactivated live virus". The Court of Appeals held more

than a quarter of a century ago in *Sillman v Twentieth Century-Fox Film Corp.* (3 NY2d 395, 404 [1957]) that issue-finding rather than issue-determination is the key to determining motions for summary judgment.

Trial Term, in the hearing it held prior to deciding the instant cross motions, conceded on the record that the testimony of Drs. Haber and Heitler was confusing at times. We agree.

Dr. Haber testified that when he first tried to identify the vaccine he used, he reviewed his office records and questioned his staff. However, when those sources failed to reveal the identity of the brand, he telephoned the New York City Department of Health (Department), since it was the practice of the Haber/Heitler office to use whatever vaccine was currently in use by the Department. Moreover, Dr. Haber admitted that if the Department had been using two types of vaccine, he would not be able to state which one he would have used. Thus, Dr. Haber testified, at an examination before trial on March 8, 1978, which was conducted by counsel for defendant Dow:

"QUESTION: Assuming that the Board of Health would tell you it was using two separate vaccines at that time, what would your procedure then have been?

"ANSWER: Then we would pick either one, one or the other.

"QUESTION: Assuming that they had told you that, doctor, do you have any independent knowledge of which one you would have used? * * *

"ANSWER: No, No. I don't know which one I would have used, had that occurred."

Defendant Dow furnished an affidavit, dated April 1985, which is part of the record before us, from Dr. Paul S. May (May), who is Deputy Assistant Commissioner, Laboratories of the Department. Dr. May stated, in pertinent part, in that affidavit: (1) that he has been employed by the Department since 1964; (2) that, in 1970 his "supervisory responsibilities included * * * the requisition and distribution of biologics including live measles vaccines"; (3) that, his office records indicate "that for the six (6) month period immediately preceding September, 1970, and the six (6) month period subsequent to September, 1970, the Department received and had available for distribution live measles vaccine as produced by Merck, Sharp & Dohme (Merck) and Pittman-Moore [note: Pittman-Moore was the affiliate of Dow that made Lirugen]";

(4) that "if a physician obtained a live measles vaccine from the * * * Department * * * in September 1970 or the six (6) month period prior thereto, the manufacturer of the vaccine would have been *either* Merck or Pittman-Moore [Lirugen]"; and (5) that "if a physician had telephoned me and inquired as to which live measles vaccine(s) was being used in September 1970 and the six (6) month period prior thereto, such physician would likely to have been informed that *both* the Merck product and the Pittman-Moore [Lirugen] product were used".

In his testimony about the vaccine used, Dr. Heitler described its color as "sort of golden tan, beige color", and that it was in granular powder form. As mentioned *supra,* Lirugen was pink in color, and it was in a cake/solid tablet form.

According to Dr. Haber, the vaccine that he administered to the infant plaintiff, came in *two* packages, since the vaccine was contained in a vial in *one* package, and a syringe containing a fixed amount of diluent was contained in *another* package. As was described *supra,* in 1970 the defendant Dow's vaccine was supplied in *one* package. Defendant Dow presented documentary evidence that in 1970 the defendant Merck's vaccine was supplied in *two* packages, to wit: (a) the Merck vaccine was contained in one package, and (b) the syringe containing the diluent was contained in another package.

Moreover, Dr. Haber testified that the vaccine he used was reconstituted by means of a one-step procedure, in view of the fact: (1) that the vaccine was contained in a vial, and a fixed amount of diluent was contained in a syringe, and (2) the reconstitution process occurred when the syringe containing the fixed amount of diluent was injected into the vial containing the vaccine and shaken up. Thereafter, the infant patient was inoculated with the same syringe. As was described *supra,* in 1970 the defendant Dow's vaccine, Lirugen, required a two-step process for reconstitution. Defendant Dow presented documentary evidence that in 1970 the Merck vaccine was reconstituted by a one-step process, since the vaccine was packaged with a fixed amount of diluent contained in a syringe.

Based upon the foregoing analysis, which points up: (1) the uncertainty of the testimony of the defendant doctors about the vaccine used; (2) the fact that the Department was using the vaccines of both defendants Merck and Dow during the relevant period; (3) the factors of the color, packaging and reconstitution process of the vaccine actually used; and (4) the

entry in the defendant doctors' office records that indicates the Roxane vaccine may have been used, we are compelled to find that neither defendants Dow, Merck or Roxane have made out "a prima facie showing of entitlement to [summary] judgment as a matter of law [since none of those defendants have tendered] sufficient evidence to eliminate any material issues of fact from the case * * * Failure to make such showing requires denial of the motion [for summary judgment]" (Winegrad v New York Univ. Med. Center, 64 NY2d 851, 853 [1985]).

The instant case presents a classic illustration of the difficulties of identifying the particular product used, when there are a number of different manufacturers and the administering physician's records are not precise. It just is not possible at this time to come to a conclusion, that any of the above-named defendants, as a matter of law, was not the manufacturer of the vaccine used to immunize the infant plaintiff. Accordingly, same should be left for a jury to decide.

Even though the plaintiffs made a claim before Trial Term concerning the theory of concerted action among the defendant pharmaceutical companies, which claim was based upon the Bichler case (79 AD2d 317, affd 55 NY2d 571, supra) before us the plaintiffs have apparently abandoned that theory, since they do not make reference to it in their brief.

Accordingly, the order, Supreme Court, New York County (Ira Gammerman, J.), entered April 22, 1985, which, inter alia, granted the cross motions of defendants Merck, Sharp & Dohme, Division of Merck & Co. (Merck), and Philips Roxane Laboratories, Inc. (Roxane) for summary judgment, is unanimously modified, on the law and on the facts, to the extent of denying the cross motions of Merck and Roxane for summary judgment, and reinstating the plaintiffs' complaint against them, and otherwise affirmed, with costs.

MURPHY, P. J., ASCH, ROSENBERGER and WALLACH, JJ., concur.

Order, Supreme Court, New York County, entered on April 22, 1985, unanimously modified, on the law and on the facts, to the extent of denying the cross motions of Merck and Philips Roxane for summary judgment, and reinstating the plaintiffs' complaint against them, and otherwise affirmed. Plaintiffs-appellants-respondents and defendant-respondent-appellant shall recover of defendants-respondents one bill of $75 costs and disbursements of this appeal and cross appeal.