OPINION OF THE COURT
Ira Gammerman, J.
Defendants Rexall Drug Company (Rexall), the Upjohn Company (Upjohn) and Abbott Laboratories (Abbott) move pursuant to CPLR 3212 for summary judgment dismissing the complaint based upon the conceded inability of plaintiffs to identify the particular manufacturer of the drug, diethylstilbestrol (DES) to which they were allegedly exposed. Defendants contend that the right to recover on collective, nonidentification or concerted action theories of liability has not been established in New York and urge the court to reject adoption of such theories. Defendants further contend that if concerted action is a viable basis of liability, it should not be applicable in a DES case. The motions are consolidated for disposition.
Plaintiffs seek to recover for injuries allegedly sustained by Elizabeth Tigue and Myrna Margolies (now deceased) as a result of the ingestion of DES by their mothers. Sayre Margo-lies proceeds on behalf of her daughter Myrna who died in 1977 at age 23, from clear cell adenocarcinoma of the cervix and vagina, a rare form of cancer in young women, associated with prenatal exposure to DES. Plaintiff Elizabeth Tigue was diagnosed as having vaginal adenosis, a precancerous condition associated with DES exposure, in which glandular tissue normally found in the cervix is found in the vagina. Plaintiffs’ *469 complaints allege breach of warranty, negligence, strict liability, res ipsa loquitur, concerted action and aiding and abetting strict liability.
HISTORICAL BACKGROUND:
DES is a synthetic hormone that duplicates the function of estrogen, a female sex hormone naturally present in women, and, in lesser amounts, in men. Estrogen is essential for female sexual development and reproduction. DES was first synthesized in 1937 by British medical researchers. The drug was never patented, and, thus, could be produced and marketed in the United States by any company obtaining Food and Drug Administration (FDA) approval of a new drug application (NDA).
By 1940, 10 drug companies had filed NDAs requesting approval to produce and market DES for treatment of menopause, senile vaginitis, gonerrheal vaginitis and suppression of lactation. None of the conditions for which this initial approval was sought related to pregnancy. These filings were rejected by the FDA, it determining that the review process would be facilitated by the pooling of clinical data produced by the drug companies into a master file which would form the data base for the FDA decision. In 1941, 12 pharmaceutical companies formed the "Small Committee”* to pool this clinical data for submission to the FDA. The joint clinical data was incorporated in each company’s resubmitted NDA and in September 1941, FDA approval was obtained for the use of DES. The Small Committee was thereafter disbanded.
In 1947 and 1948 a number of drug manufacturers filed supplemental NDAs for authorization to market DES, now for the treatment of certain pregnancy disorders relating to spontaneous abortion or fetal death. The dosage proposed for this treatment was many times stronger than the dosage previously approved in 1941. The supplemental applications were primarily based upon studies by two independent researchers on the role of hormones in pregnancy. The researchers reported that the administration of additional estrogen in certain high-risk pregnancies appeared to reduce the risk of miscarriage. The FDA approval for use of the drug in pregnancy was then given.
*470 LACK OF PRODUCT IDENTIFICATION:
The fundamental issue raised here (and the major problem facing these and many other plaintiffs in these DES cases) is their inability to identify the manufacturer of the DES taken by the mothers of the injured women and, thus, to directly connect the injury to a particular defendant.
The DES taken by pregnant women was produced under a chemically identical formula and usually manufactured and prescribed genetically. Apparently, many drug companies cannot locate or have failed to keep records of their DES market activity. Although that market was dominated by a small number of companies, entry and exit from the market was fluid and it is estimated that between 94 and 300 pharmaceutical companies manufactured or marketed DES from 1947 to 1971.
Injuries caused by prenatal exposure to DES appear many years later. Over time, the ability of a plaintiff to identify the manufacturer is, obviously, greatly reduced. The memories or records of those who could assist in identifying the manufacturer (parents, physicians, pharmacists and drug companies) fade or disappear.
prior holdings:
In this State, the general rule is that a plaintiff has the burden of proof on product identification (Morrissey v Conservative Gas Corp., 285 App Div 825 [1955], affd 1 NY2d 741 [1956]). However, several nonidentification or collective liability theories have been proposed and in some cases adopted, to deal with cases in which the manufacturer of a product cannot be identified.
In Bichler v Lilly & Co. (79 AD2d 317 [1st Dept 1981], affd 55 NY2d 571 [1982]), a theory of concerted action liability was the basis of recovery even though the defendant was not identified as the manufacturer of the particular DES taken by the plaintiff’s mother. Indeed in Bichler, the jury found that the plaintiff had not established that Lilly manufactured the DES taken by her mother.
Two theories of concerted action were submitted to the jury: concerted action by implied agreement and concerted action by substantial assistance. The jury was instructed that concerted action by agreement could be inferred from evidence of consciously parallel actions, that such consciously parallel *471 action could be the basis of a finding that the drug companies had impliedly agreed to market DES for pregnancy use without first testing the drug on pregnant mice. The trial court’s charge with respect to concerted action by substantial assistance permitted the jury to find that the failure to test DES on pregnant mice by defendant Lilly substantially aided or encouraged other companies (including, presumably, the company that marketed the DES taken by plaintiff’s mother) to market without appropriate testing.
The jury found that Lilly had acted in concert, that the failure to test was wrongful and that the injurious effects of DES were foreseeable. On appeal to the Appellate Division, defendant argued that the trial court’s concerted action charge was erroneous, an argument that the court addressed on its merits.
The Appellate Division found sufficient evidence to support the jury’s findings and, in effect, adopted the concerted action theory of liability charged by the trial court. When Bichler (supra) reached the Court of Appeals, a determination was made that Lilly had failed to properly except to the trial court’s charge on concerted action and concerted action liability was applicable only as the law of the case. The court concluded that there was adequate evidence to support concerted action liability by conscious parallelism or substantial assistance. The Court of Appeals (unlike the trial court and the Appellate Division) based its finding solely on events beginning in 1947 (formation of identical chemical standards, marketing DES without testing on pregnant mice, reliance upon the same studies to support supplemental NDAs) and indicated that the 1941 collaboration to secure approval for nonpregnancy use had no bearing upon concerted action relating to the 1947 supplemental NDA for pregnancy use (Bichler v Lilly & Co., 55 NY2d 571, 585, n 7, supra).
In Kaufman v Lilly & Co. (65 NY2d 449, 456), the court stated: "we expressed no view in Bichler and, express none now, on which of the proposed theories — concerted action, alternative liability, enterprise liability or market share liability — if any, should be adopted in this or similar DES cases (see, Bichler v Lilly & Co., supra, at p 580, n 5). The question is still an open one in New York.”
discussion:
Defendants correctly contend that the applicability of the *472 various "collective liability” theories (including concerted action) to DES fact patterns has not been finally ruled upon by the Court of Appeals. Nevertheless, the First Department clearly recognized and expressly adopted the concerted action theory for DES cases (Bichler v Lilly & Co., 79 AD2d 317, supra; Kaufman v Lilly & Co., 99 AD2d 695; see, Carrao v Heitler, 117 AD2d 308, 313).
Since plaintiffs, at least in this department, may proceed on a collective or concerted action liability theory, the inability to identify the actual manufacturer of the DES taken by Mrs. Tigue and Mrs. Margolies is not fatal. Plaintiffs’ factual allegations to support a finding of concerted action are substantially the same as those pleaded in Bichler (supra) and clearly state a viable cause of action for concert by agreement or substantial assistance.
As in Bichler (supra), plaintiffs contend that a finding of concert by conscious parallelism or substantial assistance may be supported based upon the formation of identical chemical standards for DES in pregnancy, the marketing of the drug without prior testing on pregnant mice and the drug companies’ reliance upon the same studies in supplemental NDAs. Plaintiffs also rely on defendants’ activities leading to the FDA approval for nonpregnancy use based upon the contention that their supplemental NDAs relied upon the earlier filing. Whether the request for approval of DES for use in pregnancy relied upon the earlier filings presents an issue of fact which cannot be determined on a motion for summary judgment. Similarly, defendant’s claims that the actions by the drug companies in gaining FDA approval of DES (whether for nonpregnancy or pregnancy use) and their actions with regard to the manufacture, marketing and distribution of DES for use in pregnancy constitute concerted action sufficient to impose liability are questions for the trier of fact.
In addition, plaintiffs apparently seek to impose industry-wide liability based upon wrongful failure to test and subsequent generic marketing and dispensing of DES. Plaintiffs’ basic theory is that "but for the development, manufacture, distribution and sale of DES by the defendants, plaintiffs would not have suffered the injuries which they have suffered.”
Plaintiffs contend that under their "but for” analysis, in addition to concert, they would be permitted to recover under various nonidentification theories: enterprise liability (Hall v *473 Du Pont de Nemours & Co., 345 F Supp 353 [ED NY 1972]); alternative liability; market share liability (Sindell v Abbott Labs., 26 Cal 3d 588, 163 Cal Rptr 132, 607 P2d 924, cert denied 449 US 912); risk contribution (Collins v Lilly Co., 116 Wis 2d 166, 342 NW2d 37, cert denied sub nom. Squibb & Sons v Collins, 469 US 826).
This court declines to rule at this time on the applicability to DES cases of each of the various theories of liability (in addition to concerted action), which are not specifically pleaded but are raised in response to defendants’ motions. The only question raised on the motions before this court is whether defendants may be held liable absent product identification and the answer is yes.
claims of exculpation:
Defendants Rexall and Upjohn contend that under any collective liability theory, a defendant who can establish that its product could not have caused plaintiffs injury may exculpate itself from liability. While exculpation may be theoretically possible (certainly under market share liability), even if the product of a particular manufacturer could be excluded a defendant may bear legal responsibility based on joint activity, encouragement or assistance in bringing a harmful product into the stream of commerce.
CONSTITUTIONAL ATTACK:
Rexall further contends that any theory of liability (including judicially established tort doctrines) under which liability may be imposed without "causation-in-fact”, presumably product identification, is unconstitutional as an excessive burden on interstate commerce and violative of the Due Process and Equal Protection Clauses. Further, it argues, that imposing market share and enterprise liability frustrate expressed Federal policies regarding the marketing of prescription drugs and thus violate the Supremacy Clause.
Defendant Rexall’s due process challenges are unpersuasive. Under the various theories discussed above, the requirement of traditional product identification is merely relaxed based on a finding that each defendant by its tortious behavior caused or contributed to plaintiffs injuries. Under these theories, liability may be premised upon the tortious behavior of each defendant, whose adherence to a course of conduct resulting in an unsafe standard, perpetuates the standard.
*474 Fundamentally, imposition of liability absent product identification is based on policy grounds. As a matter of equity, the tort-feasor (who is in the best position to absorb the cost and to take the precautions) rather than the innocent victim, should bear the cost of injury. Defendants can be held responsible for wrongful conduct or omissions that result in placing a generic/fungible harmful product on the market.
Rexall’s equal protection challenge amounts to no more than a fairness argument which does not rise to constitutional proportions. Equal protection is not synonymous with absolute equality (see, Dandridge v Williams, 397 US 471; People v Parker, 41 NY2d 21; Parker 86th Assocs. v City of New York, 93 AD2d 388, affd 59 NY2d 986).
Rexall’s Federal preemption claim also lacks merit. "The criteria for determining whether there has been federal preemption are (1) the pervasiveness of the federal regulation, (2) the dominance of the federal interest, (3) the federal and state objectives to be obtained, and (4) the existence of actual conflict between the state and federal statutes, including whether the state law is an obstacle to the purposes and objectives of Congress” (Pharmaceutical Socy. v Lefkowitz, 586 F2d 953, 958 [2d Cir 1978]). Application of these criteria precludes a finding of Federal preemption. The primary objective of the Federal law is controlling product safety and efficacy (supra, at 958). The objective of the proposed theories of recovery is basic fairness, to provide a remedy to the innocent victims of wrongdoers.
Rexall contends that the imposition of liability without product identification burdens interstate commerce, by increasing the cost of products, reducing availability and limiting sales by discouraging development of new drugs, and by generally increasing the cost of doing business thereby precluding entry into the pharmaceutical business.
In determining whether there is an undue burden on interstate commerce, the test is whether " 'the burden * * * on [interstate] commerce is clearly excessive in relation to the putative local benefits’ ” (Pharmaceutical Socy. v Lefkowitz, supra, at 957, quoting Pike v Bruce Church, 397 US 137, 142). Here, the local benefit is providing a forum to innocent victims of alleged wrongdoing by relaxing the traditional product identification requirement in tort law. Clearly, a legitimate State interest is furthered. While adoption of a nonidentification theory of liability could conceivably burden *475 interstate commerce to the extent that the cost of such increased liability would be passed on to consumers through higher prices,” not every exercise of local power is invalid merely because it affects in some way the flow of commerce between the States” (A & P Tea Co. v Cottrell, 424 US 366, 371). Rexall has failed to demonstrate that the burden here would be clearly excessive compared to the benefit. Therefore, the Commerce Clause challenge also must fail.
Accordingly, defendants’ motions for summary judgment dismissing the complaint are denied, and the matter is set down for trial on September 30, 1987.

 The 12 companies were: Abbott; Armour Laboratories; Ayerst, McKenna & Harrison, Ltd.; Geo. A. Breon & Co., Inc.; Charles E. Frost & Co.; Eli Lilly & Co.; Merck & Co., Inc.; Sharpe & Dohme, Inc.; E. R. Squibb & Sons; Upjohn Winthrop Chemical Company; and John Wyeth & Brothers, Inc.